308 P.2d 949

Mathew J. McCORMICK, Plaintiff and Respondent,

v.

LIFE INSURANCE CORPORATION OF AMERICA, a corporation, Defendant and Appellant.

No. 8593.

Supreme Court of Utah.

March 20, 1957.

Reese C. Anderson, G. Hal Taylor, Salt Lake City, for appellant.

George McMillan, Salt Lake City, for respondent.

## CROCKETT, Justice.

This is an action on a contract to recover commissions for subscriptions and sales of stock in defendant Life Insurance Corporation of America, referred to as Licoa.

In September, 1952, the defendant Licoa was in the process of changing from a mutual to a stock company. It entered into an agreement with plaintiff, Mathew J. McCormick, allowing him exclusive rights to sell the stock in the company and to receive a 20% commission on said sales.

McCormick and salesmen employed by him sold stock totaling $275,880 for which was received and delivered to the company:

| | |
|---|---|
| Cash | $142,729.86 |
| Personal notes | 32,961.71 |
| Real estate mortgages and contracts | 41,180.00 |
| Subscription notes | 59,008.43 |

The latter class of obligations contained a provision that the only remedy for default was to retain the amounts already paid in as liquidated damages. Plaintiff was paid commission on only $123,600 of the above total.

During February and March, 1954, some of the real estate mortgages and contracts and all of the subscription notes were cancelled by the company without any attempt to enforce them. Nor was McCormick given any opportunity to do so. The company refused to pay plaintiff any further commissions, wherefore this suit was instituted.

The trial court ruled that plaintiff was entitled to recover additional commissions of $22,842 on the $152,280 upon which commission had not been paid, allowing only 15% instead of the 20% allowed by the contract, for reasons presently to be discussed. However, plaintiff was permitted to keep the full 20% on the commissions he had already collected.

From that judgment defendant appeals on the following grounds:

(A) That the plaintiff is not entitled to commissions on the cancelled obligations because they were in default;

(B) That because our statute [1] prohibits paying more than 15% for promotional and organizational purposes, the defendant should be entitled to recover back, or offset, amounts in excess thereof paid at the 20% rate; and

(C) That the court erred in refusing to consider testimony concerning other expenses claimed to be chargeable to organization and promotion and thus required to be figured in the 15% allowed for that purpose by statute.

The plaintiff's cross appeal, contending that he is entitled to the full 20% commission, not only on what he had already collected, but on all sales and subscriptions he had obtained, is disposed of in discussing appellant's points.

■■■ (A) Notwithstanding the fact that the subscription contracts were in default, and the only remedy they gave the company was to cancel the stock and retain the amount of liquidated damages, it was nevertheless the company's duty to exercise good faith and reasonable diligence in attempting to enforce the obligations before cancelling them. There was evidence that they cancelled them without any such effort and used the subscribers as prospects to solicit other stock subscriptions. The rule is well settled that if the failure of completion of the contract results from the fault or neglect of the principal, it is nevertheless responsible to the agent who rendered the service of procuring the contract.[2] There being substantial evidence to support the finding of the trial court that the company violated its duty to the plaintiff, the judgment in that regard will not be disturbed.

(B) Of more serious import is the problem presented by the statute which limits the amount to be expended for organizational purposes to 15%. There is no dispute about the fact that this contract for 20% was in violation of the statute. The disagreement is as to the effect thereof and the rights of the parties under it.

While the plaintiff does not gainsay the rule that generally the parties to an illegal contract cannot enforce it, but the court will leave them as it finds them,[3] he claims

1. 31-6-7 U.C.A.1953. "Every solicitation permit issued by the commissioner shall: * * * (3) limit the portion of funds received on account of stock subscriptions, if any are proposed to be taken, which may be used for promotion and organization expenses to such amount as he deems adequate, but in no event to exceed fifteen per centum of such funds as and when actually received; * * *."

2. See e.g. Stewart v. Lesin, 5 Utah 2d 383, 302 P.2d 714; Curtis v. Mortensen, 1 Utah 2d 354, 267 P.2d 237; Hoyt v. Wasatch Homes, Inc., 1 Utah 2d 9, 261 P. 2d 927.

3. Sec. 598, Restatement of Contracts. "A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value, except as stated in Sections 599-609."

to come under an exception thereto as stated in Sec. 599 of the Restatement of Contracts:

"Where the illegality of a bargain is due to

(a) facts of which one party is justifiably ignorant and the other party is not, or

(b) statutory or executive regulations of a minor character relating to a particular business which are unknown to one party, who is justified in assuming special knowledge by the other party of the requirements of the law, the illegality does not preclude recovery by the ignorant party of compensation for any performance rendered while he is still justifiably ignorant, * * *."

In justification of his contention that he is entitled to full recovery under the doctrine just set forth, plaintiff points out that he was a salesman imported from California; that he had very limited experience in connection with such promotions; was without legal training; and particularly was unacquainted with Utah insurance laws and had no knowledge of the statutory restriction in question; whereas, he was dealing with officials of the company, Mr. Cleo Bullard, its president, Mr. Harry Pugsley, its attorney, and Mr. Ashby Thatcher, another officer, who had been Insurance Commissioner for several years, all of whom were experienced in such matters and either knew, or should have known, the law, and have been acting advisedly in offering him the 20% contract. Parenthetically we state that there is no claim of bad faith in this regard on the part of these officers. They all appear to have acted upon the assumption that conversion from a mutual to a stock company did not require compliance with the code for organization of stock companies.

Defendant's invocation of the so-called general rule that contracts in violation of law are void and unenforceable, and plaintiff's interjection of the just discussed exception, suggests the advisability of taking a critical look at the rule. Survey of the authorities reveals that when contracts involve gambling, immorality or violation of laws purposed to the protection of health, morals or welfare, the law, as a matter of policy, regards the contracts as void and refuses to take cognizance thereof or to grant any relief. However, arbitrary refusal to grant relief under contracts merely in violation of statute often brings about such incongruous results in giving advantages to wrongdoers and penalizing the relatively innocent that the courts have carved out so many exceptions to the so-called "general rule" that it can hardly be properly so denominated.[4]

4. See §§ 599–609 Restatement of Contracts.

■ The actual fact is that the courts look at the over-all picture of each such questioned contract and determine upon the facts of the individual case whether the ends of justice demand that relief be granted. In making such determination the following factors are taken into consideration: (a) the degree of criminality or evil involved; (b) the moral quality of the conduct of the parties; (c) comparison between them as to guilt or innocence; (d) the equities between them; and (e) the effect upon third parties or the public.[5]

■ It is plain that the limitation of 15% for promotion expenses has a purpose beyond mere formal regulations to be complied with in organizational procedure and beyond the rights of the immediate parties to the instant contract. That purpose is to protect subscribers to the stock and the public by assuring that the capital so raised may not be improvidently dissipated, but will be kept in the trust fund as designated by the code to provide substance to such newly formed corporation.[6] This purpose can only be fulfilled if any amount in the contract above the allowable 15% is deemed unenforceable under the law. As to such excess, the rights of subscribers and the public are in jeopardy and that factor is of controlling importance.

If the law were such that the parties could make a contract for an excessive commission, oblivious to or ignoring the statute, and when the agent asserted his claim for compensation, invoke estoppel to preclude the company from asserting the 15% limitation as a defense, the statute would be thus nullified by the simple device of ignoring it. This would not only have the harmful effect of depriving the public and third parties of the protection it was designed to give, but furthermore, as the Supreme Court of Ohio said in a case where the 15% limitation was sought to be circumvented,[7] "Its presence on the statute books would be a decoy for credulous subscribers of stock, inducing in them the belief that 85% of their subscriptions was impounded for their benefit," when such was not the fact.

■ For the reasons above mentioned the trial court correctly ruled that the plaintiff could recover only 15% of his total sales and subscriptions. For the same reasons he is obliged to credit the company with the 5% excess commissions on the sales for which he has already collected 20%.

5. See Corbin on Contracts, § 1534.

6. 31-6-12, U.C.A.1953. "All funds received on account of subscriptions, applications, or solicitations shall be deposited and held in escrow in a bank or trust company under an agreement approved by the commissioner. * * *"

7. Anchor Life & Accident Ins. Co. v. Taylor, 29 Ohio App. 428, 163 N.E. 631. See also Appleman, Insurance Law and Practice, § 10005; Fletcher, Cyclopedia Corporations, § 208.

■ (C) The remaining problem relates to the refusal of the trial court to consider evidence concerning expenses claimed to be for organizational and promotional purposes, and which defendant contends must be figured in the maximum of 15%, and thus deducted from the money payable to the plaintiff. This evidence consisted of the defendant's approximation of the proportion of office rental, salaries and other expenses incidental to maintenance of the company office which it said was allocable to promotion. These expenses appear to have been current operating and administrative expenses of the company, which would have continued regardless of whether it remained a mutual, or went through the transition into a stock company. It was shown that no office space was furnished exclusively for McCormick and that he used the same space as the company insurance salesmen. Further, an exact figure could not be put on the amount of secretarial assistance or other claimed items of expense. It therefore seems clear that there was no basis upon which it could be determined with any degree of certainty that the expenditures could properly be classified as promotional or organizational expense.

We recognize, however, that there is a more basic problem to be confronted than the quality of this evidence. Even if it be assumed that the expenses could be separated and definitely allocated to promotional and organizational expenses, there are other reasons which support the trial court's action in refusing to consider such evidence. Disallowance of the amount above the permissible 15% takes care of the interest of subscribers and the public, and leaves us to a consideration of the rights under the contract between the parties.

As to the portion of the contract below 15%, it is significant to realize that in this action we are adjudicating only the rights between the plaintiff and the defendant themselves. Whether other persons may have rendered services to the company and have claims against it which would be properly classified as promotional expenses we are not here concerned. The trial court properly refused to become referee as to claimed expenditures to others not parties to this suit. It is obvious that the company interjected this contention simply as another string to its bow in attempting to defeat plaintiff's claim, and equally obvious that it would be unjust to allow such a defense.

Eliminating concern over interests of others not parties to the contract, and viewing the situation between plaintiff and Licoa in the light of the other factors set forth above which bear upon the enforceability of such contracts, the scales of justice swing heavily in plaintiff's favor. Within the legal limits of 15%, there would be no wrong either in the obligations running to him under the contract, nor in his perform-

ing services under the assumption that the company would keep its part of the bargain. It would be quite preposterous to suppose that such an agent must police the internal management of the company to see that no other expenditures chargeable to promotion were made so his 15% would remain inviolate. To postulate that the law would place any such burden upon him approaches the ridiculous. The only persons who can so manage the company's affairs are its officers, and that is their responsibility. As an aside, while the matter is not before us, nor adjudicable in this action, if the defendant's officers have spent or obligated other expenses for promotion in excess of 15%, it may be that they should be required to make the fund whole, or have other sanctions of the law imposed for such dereliction. As between the parties, we do not see any considerations of policy or otherwise that would justify permitting the company to reap the benefit of the plaintiff's services, and turn their own wrong into an advantage by pleading that they had expended money for other promotional purposes in violation of statute, and thus avoid their obligation and deprive plaintiff of compensation for his work.

The judgment of the trial court in allowing the plaintiff commission of 15% on all subscriptions to stock obtained, including those cancelled by the company, is affirmed. As to the commissions collected in excess of 15%, the account should be adjusted and such excess allowed as an off-set in favor of the company.

Costs to plaintiff (respondent).

McDONOUGH, C. J., and WADE, WORTHEN and HENRIOD, JJ., concur.