CASTLEGLEN, INC., a California corporation, and Larry B. Harvey, an individual, Plaintiffs and Counterdefendants,

v.

COMMONWEALTH SAVINGS ASSOCIATION, a Texas savings and loan association; Klein Financial Corporation, a California corporation; Robert N. Klein II, an individual; Santa Fe Apartments, Ltd., a Utah limited partnership; Busch Management Company, a Utah corporation, and Western States Title Company, Defendants and Counterclaimants.

EMERSON REALTY &
MANAGEMENT,
Plaintiff,

v.

CASTLEGLEN, INC., a California corporation; and Commonwealth Savings Association, a Texas savings and loan association, Defendants.

Civ. Nos. C–87–829W, C–87–1076W.

United States District Court,
D. Utah, C.D.

Dec. 26, 1989.

See also 689 F.Supp. 1069.

658

Earl M. Benjamin, John A. O'Malley, Douglas J. Rovens and Jack A. Gould, Los Angeles, Cal., and David B. Erickson, Salt Lake City, Utah, for Castleglen and Harvey.

Stephen G. Crockett, Patricia W. Christensen, Ronald G. Russell and Heidi E.C. Leithead, Salt Lake City, Utah, for Commonwealth Sav. Ass'n.

Gary F. Bendinger, Richard W. Casey and Carol Clawson, Salt Lake City, Utah, for Klein Financial Corp. and Robert Klein II.

Michael R. Carlston, R. Brent Stephens, Stanley K. Stoll and Jerry D. Fenn, Salt Lake City, Utah, for Santa Fe and Busch.

Dennis L. Mangrum, Salt Lake City, Utah, for Emerson Realty & Management.

Neal B. Christensen, c/o Wicat Systems, Orem, Utah, for Neal B. Christensen.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

The court heard argument on a number of motions on November 2, 1989. Plaintiffs Castleglen, Inc. ("Castleglen" or "plaintiffs") and Larry B. Harvey were

represented by David B. Erickson, Earl M. Benjamin, John A. O'Malley, and Douglas A. Rovens. Emerson Realty and Management was represented by Dennis L. Mangrum. Defendants Resolution Trust Corporation and the FSLIC ("defendants"), as receiver for Commonwealth Savings Association and as conservator for Commonwealth Federal Savings Association, were represented by Clark Waddoups, Patricia W. Christensen, Ronald G. Russell and Heidi E.C. Leithead. Defendants Klein Financial Corporation and Robert N. Klein II were represented by Richard W. Casey, who was excused at the commencement of the hearing because of his clients' limited involvement in these motions.

This matter is before the court on the following motions: (1) defendants' motion for substitution; (2) defendants' motion for summary judgment; (3) plaintiffs' motion for writ of attachment; (4) plaintiffs' objections to defendants' proposed order for partial summary judgment; (5) plaintiffs' motion for issuance of an order to show cause for Rule 11 sanctions against defendants; and (6) plaintiffs' motion for leave to file a second amended complaint.

Prior to the hearing, the court had carefully reviewed the written materials submitted by the parties. After taking the matter under advisement, the court has further considered the voluminous record filed by the parties relating to these motions. The court, now being fully advised, renders the following memorandum decision and order.

## BACKGROUND

This case involves the sale of the Santa Fe Apartments Project (the "Project"), located in Salt Lake City, Utah. The Project was originally developed and constructed with financing provided from the sale of tax exempt bonds issued by the Salt Lake County Housing Authority on September 1, 1984. Commonwealth Savings Association ("Commonwealth" or "Commonwealth Savings") facilitated the financing arrangement by issuing a Letter of Credit in the approximate amount of seventeen million dollars ($17,000,000) to Zions Bank, as Trustee for the bondholders, guaranteeing repayment of the principal and interest on the bond loan to the Housing Authority bondholders. In return for Commonwealth's participation in the financing of the Project, Santa Fe Ltd. ("Santa Fe") executed a Reimbursement Agreement with Commonwealth under which Santa Fe agreed to make monthly debt service payments to Commonwealth in anticipation of semi-annual draws against the Letter of Credit by Zions Bank and to pay Commonwealth a fee for providing its Letter of Credit and for servicing the bond loan. Santa Fe's monthly debt service obligations under the Reimbursement Agreement with Commonwealth were secured by a Second Lien Deed of Trust and Security Agreement, and a Second Assignment of Rents, Issues, and Profits on the Project.

On December 28, 1986, Santa Fe entered into a written agreement to sell the Project to OMA Cypress Properties, a predecessor of Castleglen. OMA Cypress Properties, in turn, conveyed the Project to Cypress View, Ltd., also a predecessor to Castleglen. The Purchase Agreement specifically recognized the existence of the bond loan encumbrance and refers to the original promissory note, the first lien security instruments, the Reimbursement Agreement, and the second lien security instruments. Pursuant to an Assumption Agreement dated December 31, 1986 between Santa Fe and Cypress View Ltd., Cypress View Ltd. expressly assumed the obligations of the bond loan documents, including the Reimbursement Agreement and the second lien security instruments.

On or about July 21, 1987, Commonwealth served plaintiffs with written notice of default under the bond loan, indicating that they intended to exercise their remedies under the terms of the loan documents. Plaintiffs filed an amended complaint on March 14, 1988, asserting the following causes of action against Commonwealth: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5; (2) violation of Section 12(2) of the 1933 Securities Act; (3) fraud and misrepresentation; (4) negligent misrepresen-

tation; (5) negligence; (6) violations of section 61–2–22 of the Utah Uniform Securities Act; (7) breach of fiduciary duty; and (8) breach of covenant of good faith and fair dealing.

In a Memorandum Decision and Order dated May 8, 1989, this court determined that the transaction at issue was not an investment contract and accordingly dismissed plaintiffs' state and federal securities claims. The specific claims against Commonwealth Savings which remain in this action following the May 8, 1989, decision are the state based claims of fraud and misrepresentation, negligent misrepresentation, negligence, breach of fiduciary duty, and breach of an implied covenant of good faith and fair dealing.[1] These remaining claims against Commonwealth Savings all stem from four alleged misrepresentations made in a conference telephone call between Harvey, Fisher, and Weakland on December 24, 1986.[2]

Meanwhile, on March 8, 1989, the Federal Home Loan Bank Board ("FHLBB") determined that Commonwealth Savings was insolvent and appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") sole conservator for Commonwealth Savings. *See* Resolution No. 89–703, Exhibit D, Defendants' Memorandum in Support of Motion for Summary Judgment. On May 16, 1989, the FSLIC, as conservator of Commonwealth Savings, filed a motion for summary judgment under the *D'Oench* doctrine. Defendants argue that these alleged oral misrepresentations constitute an unwritten side agreement falling squarely within the *D'Oench* doctrine. Subsequently, on May 23, 1989, the FHLBB replaced the FSLIC as conservator with the FSLIC as receiver for Commonwealth Savings. *See* Resolution No. 89–1501, Exhibit A, Defendants' Supplemental Memorandum in Support of Summary Judgment. Also on May 23, 1989, the FSLIC chartered a new federal mutual association, Commonwealth Federal Savings Association ("Commonwealth Federal") "to facilitate the liquidation of [Commonwealth Savings] and to make available accounts, including insured accounts, to the insured account holders of [Commonwealth Savings]." *See* Organization of Commonwealth Federal Savings Association, Exhibit D, Defendants' Supplemental Memorandum in Support of Summary Judgment. The FSLIC was appointed conservator of Commonwealth Federal on May 23, 1989. *See* Appointment of Conservator for Commonwealth Savings Association, Exhibit E, Defendants' Supplemental Memorandum in Support of Summary Judgment. On May 25, 1989, the FSLIC, as receiver of Commonwealth Savings, entered into an Acquisition Agreement with Commonwealth Federal whereby Commonwealth Federal purchased Commonwealth Savings' assets held by the FSLIC as receiver. *See* Acquisition Agreement, Exhibit B, Defendants' Supplemental Memorandum in Support of Summary Judgment. On June 16, 1989, the FSLIC, as conservator for Commonwealth Federal, filed a supplemental memorandum in support of their motion for summary judgment under the *D'Oench* doctrine.

Finally, after the parties had briefed the FSLIC's motion for summary judgment, President Bush signed into law the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (the "FIRRE Act") on August 9, 1989. The FIRRE Act abolished the FSLIC and created the Resolution

---

1. In the decision rendered on May 8, 1989, the court determined, in light of the scheduling order in effect at that time, that justice would best be served by maintaining pendent jurisdiction over the state claims, despite the absence of a federal question.

2. The four alleged misrepresentations were summarized in the court's Memorandum Decision and Order of May 8, 1989, as follows:
 1. That both Fisher and Klein misrepresented that Emerson had run new cash flow projections.

2. That both Klein and Fisher said that Emerson said that only $600,000 would be spent before breakeven.
3. That Fisher said he had looked at the new numbers, that they were good numbers, and that the project would break even in the summer of 1987.
4. That both Klein and Fisher said a refunding was no longer needed, that the deal would work without a refunding.
*Id.* at 17.

Trust Corporation (the "RTC"), which "succeed[s] the Federal Savings and Loan Insurance Corporation as conservator or receiver with respect to any institution for which the Federal Savings and Loan Insurance Corporation was appointed conservator or receiver during the period beginning on January 1, 1989 and ending on [August 9, 1989]." Pub.L. No. 101–73, § 501, 103 Stat. 183, 363, 370 (1989). Defendants therefore request the court to substitute the RTC as the proper party defendant in this matter.

## DEFENDANTS' MOTION FOR SUBSTITUTION

■ Commonwealth Savings was placed into conservatorship, under the FSLIC, on March 8, 1989. Commonwealth Savings then filed a motion to substitute the FSLIC, as conservator for Commonwealth Savings, as the proper party defendant in this action. Subsequently, Commonwealth Savings was placed into receivership under the FSLIC, Commonwealth Federal was chartered, and the FSLIC, as receiver of Commonwealth Savings, entered into an Acquisition Agreement with Commonwealth Federal whereby Commonwealth Federal purchased Commonwealth Savings' assets held by the FSLIC as receiver. The FSLIC then filed an amended motion to substitute the FSLIC as conservator for Commonwealth Federal as the proper party defendant in this action. Finally, as a result of the FIRRE Act, the FSLIC filed yet another motion to substitute the RTC, as successor to the FSLIC as receiver of Commonwealth Savings and as conservator for Commonwealth Federal, as the proper party defendant.

Inasmuch as the FHLBB determined that Commonwealth Savings was insolvent and appointed the FSLIC as conservator, the FSLIC succeeded as a matter of law to all the rights of Commonwealth Savings. 12 U.S.C.A. §§ 1464(d)(6)(D), 1729(b) and (c)(1)(B)(i)(II), 12 C.F.R. §§ 547–48. This court has previously recognized that the FSLIC, as conservator or receiver, suc-

ceeds to all the rights of the insured institution. *FSLIC v. Oldenburg,* 671 F.Supp. 720, 723 (D.Utah 1987). The same holds true for the FSLIC as conservator of Commonwealth Federal.

Furthermore, under the FIRRE Act, Congress abolished the FSLIC, created the RTC, and provided that the RTC shall succeed the FSLIC as conservator or receiver of institutions that went into receivership or conservatorship between January 1, 1989, and August 9, 1989. The FIRRE Act further provides for the substitution of the RTC as the appropriate party in pending lawsuits. Pub.L. No. 101–73, § 501, 103 Stat. 363, 389 (1989). Accordingly, defendants' motion to substitute the RTC as party defendant is hereby granted.

The RTC, as receiver for Commonwealth Savings and as conservator for Commonwealth Federal, now moves for summary judgment under the *D'Oench* doctrine and under the FIRRE Act.

## STANDARD OF REVIEW

The standard for ruling on summary judgment motions is set forth in Federal Rule of Civil Procedure 56(c). Summary judgment shall be granted when parties to a lawsuit do not dispute any material facts and judgment in favor of the moving party is appropriate as a matter of law. A moving party may demonstrate no material facts are disputed through pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. The moving party must show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has carried this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553.[3] The nonmoving party must "make a

---

**3.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett,* 477

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The evidence sufficient to make a showing must be admissible under the evidentiary standard to be used at trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

In considering a summary judgment motion, this court does not weigh the evidence but inquires whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510.[4] All inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The motion will be granted if it raises at least one legally sufficient defense to bar the plaintiff's claim and no triable issue of fact relates to that defense.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT UNDER THE D'OENCH DOCTRINE AND THE FIRRE ACT

■ As discussed above, the RTC has succeeded the FSLIC as receiver of Commonwealth Savings and as conservator of Commonwealth Federal as a matter of law. We note at the outset of our discussion that case law establishes that a successor in interest to the FSLIC is entitled to assert the *D'Oench* doctrine to protect it from claims originally asserted against the failed financial institution. *RSR Properties, Inc. v. FDIC*, 706 F.Supp. 524, 531 (W.D.Tex. 1989); *Gulf Fed. Sav. & Loan Ass'n v. Mulderig*, No. 87–3503 (E.D.La. Mar. 10, 1989) (1989 WL 23790).

■ Shortly before oral argument was heard on these matters, plaintiffs filed a response in which they argued, *inter alia*, that the *D'Oench* doctrine no longer survives the FIRRE Act. Plaintiffs base their argument on *City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), in which the Supreme Court held that a federal court could not impose more stringent limitations, under federal common law, than those imposed by Congress in the Federal Water Pollution Control Act Amendments of 1972. The case involved a claim for abatement of a nuisance created by interstate water pollution.

Defendants argue that the broad policy behind the *D'Oench* doctrine, of protecting federal financial regulatory agencies and the public funds which they administer, survives the FIRRE Act. Specifically, they argue that when Congress enacted 12 U.S.C.A. § 1823(e), which codified the *D'Oench* doctrine as it applies to the FDIC in its corporate capacity, there was no indication that Congress intended to supplant the common law doctrine. Defendants further argue that in recent years numerous courts have held that the common law doctrine applies in those instances where the specific statutory language does not apply.

Plaintiffs have offered no support for their argument from the legislative history of the FIRRE Act and the court has found none. The court is not persuaded that the *D'Oench* doctrine no longer survives. In light of the fact that we find defendants are protected under both the *D'Oench* doctrine and the FIRRE Act, we address each of them in turn.

### A. The D'Oench Doctrine

In 1942, the United States Supreme Court held that a "secret agreement", i.e. an agreement that is not expressly reflected on the face of a loan document, is unenforceable against the FDIC. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The doctrine has been codified, as it applies to

---

U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

4. "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

the FDIC, at 12 U.S.C.A. § 1823(e) (West 1989).[5] In *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the United States Supreme Court held that Section 1823(e) bars unwritten conditions incident to a borrower's obligations under a loan transaction. The Tenth Circuit, in *FDIC v. Galloway,* 856 F.2d 112 (10th Cir. 1988), summarized the *D'Oench* doctrine as applied in *Langley:*

> In *Langley,* the makers of a promissory note alleged that the payee procured their agreement to pay through factual misrepresentations. The Court unanimously rejected the makers' argument that the word "agreement" encompasses only an express promise to perform an act in the future; the Court held that "agreement" also includes conditions imposed upon the obligation to pay and representations or warranties made by the payee bank as part of the loan transaction.

*Id.* at 114–15 (citations omitted).

The common law doctrine has been expanded to protect the FSLIC, as well as the FDIC, from undisclosed agreements. *Mainland Sav. Ass'n v. Riverfront Assoc., Ltd.,* 872 F.2d 955, 956 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989). In *Mainland,* the Tenth Circuit summarized the *D'Oench* doctrine as follows:

> In *D'Oench,* the Supreme Court established that the debtor's signing of a facially unqualified note subject to an unwritten and unrecorded condition constitutes an arrangement which is likely to mislead federal insurers in contravention

of the policy to protect them in their evaluation of financial institutions.

*Id.* (citation omitted).

The doctrine is mandated by the necessity for accuracy in regulatory records. *First State Bank of Wayne County v. City and County Bank of Knox County,* 872 F.2d 707, 715 (6th Cir.1989). To carry out their duties, the FSLIC or FDIC must be able to rely on the books and records of financial institutions as being accurate and reflecting the true condition of the bank's affairs. *Id.* The doctrine allows the FSLIC or FDIC to evaluate a financial institution quickly and accurately and to make decisions, often overnight, regarding the liquidation, merger, or transfer of a failed institution.

Plaintiffs argue that the *D'Oench* doctrine does not apply to the instant case for a number of reasons. We address each of these arguments in turn.

### 1. The D'Oench Doctrine Bars Affirmative Claims as well as Defenses.[6]

■ Plaintiffs rely on *Grubb v. FDIC,* 868 F.2d 1151 (10th Cir.1989) to support their argument that the *D'Oench* doctrine does not bar plaintiffs' affirmative claims. In *Grubb,* the Tenth Circuit held that the FDIC could not claim the protection of the *D'Oench* doctrine when a judgment that voided a promissory note had been entered prior to the time the financial institution was placed under regulatory control. *Id.* at 1159. Because the note had already been declared void before the bank was placed into receivership, the court reasoned that the FDIC had not acquired any asset that could be protected by *D'Oench.*

---

**5.** 12 U.S.C.A. § 1823(e), prior to amendment by the FIRRE Act, provides as follows:

(e) Agreements against interests of Corporation

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the ob-

ligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

**6.** "Courts regularly invoke [the *D'Oench* doctrine] to bar nearly every defense by the maker of a note against the FDIC or FSLIC." *FSLIC v. Locke,* 718 F.Supp. 573, 582 (W.D.Tex.1989).

To the extent that the *D'Oench* rule may provide residual protection to the FDIC as receiver, that protection is unavailable against Grubb's affirmative claims of fraud. First, Grubb asserted the fraud claims and obtained a judgment against First National, not the FDIC. By its very terms, however, the *D'Oench* rule only prevents parties from raising defenses against the FDIC. Moreover, because of the judgment, First National no longer held valid notes when the FDIC took over as receiver. The FDIC cannot claim the protection of *D'Oench* when a judgment already has voided the asset.

*Id.* (citations omitted).

The *Grubb* case is clearly distinguishable from the case at bar. Here, plaintiffs have not recovered a judgment against defendants. Moreover, this court has held that the bond loan documents are valid and enforceable and the plaintiffs must fulfill their contractual obligations. *See* Memorandum Decision and Order of May 8, 1989, at 37–40. Furthermore, the court declines to interpret *Grubb* as barring all affirmative claims under the *D'Oench* doctrine. To do otherwise would be contrary to the great weight of authority[7] and be analytically unsound.

To contend, as plaintiffs do, that the holding is not applicable to their affirmative claims against the FDIC is, while technically defensible, to misunderstand *Langley's* import. To allow a claim *against* the FDIC asserting the very grounds that could not be used as a

defense to a claim *by* the FDIC is to let technicality stand in the way of principle. Moreover, the effect of such an approach would be to reduce actions Congress has allowed the FDIC to pursue to nullities since defendants could counterclaim and recover what they lost.

*Beighley v. FDIC,* 676 F.Supp. 130, 132 (N.D.Tex.1987), *aff'd,* 868 F.2d 776 (5th Cir. 1989).

### 2. November 1986 Conveyance to Limited Partnership.

Plaintiffs argue that defendants transferred their interest in the Project to Commonwealth Mortgage of America, L.P. in November of 1986, a month prior to the closing of plaintiffs' transaction with Commonwealth Savings. Plaintiffs base this argument on their interpretation of the Restated Conveyance Agreement[8] (the "RCA"), effective as of November 10, 1986.[9] In particular, plaintiffs rely on the following provisions of the RCA:

Section 1.1 *Contribution and Transfer of Mortgage Banking Assets.* Effective as of the Closing Time, CSA [Commonwealth Savings Association] and CMCA [Commonwealth Mortgage Corporation of America] do HEREBY GRANT, CONVEY, ASSIGN, TRANSFER and DELIVER unto Commonwealth Mortgage, its successors and assigns, all right, title and interest of CSA and CMCA in and to the following assets . . . :

. . . .

7. Numerous courts recognize that Section 1823(e) and the *D'Oench* doctrine operate to bar both defenses and affirmative claims for relief. *See, e.g., First State Bank of Wayne County v. City and County Bank of Knox County,* 872 F.2d 707, 717 (6th Cir.1989) (*D'Oench* doctrine bars plaintiff's claim for specific performance of oral loan repurchase agreement against FDIC as receiver for insolvent bank); *Chatham Ventures, Inc. v. FDIC,* 651 F.2d 355, 359 (5th Cir.1981), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982) (Section 1823(e) protects FDIC from defenses or claims); *FSLIC v. Locke,* 718 F.Supp. 573, 583 (W.D.Tex.1989) (*D'Oench* doctrine protects FSLIC from plaintiff's affirmative defenses and counterclaims); *In re Hunter,* 100 B.R. 321 (Bankr.S.D.Tex.1989) (*D'Oench* doctrine protects FSLIC against defenses or claims based on a secret or side agreement

between the borrower and the failed bank); *Gulf Fed. Sav. & Loan Ass'n v. Mulderig,* No. 87–3503 (E.D.La. Mar. 10, 1989) (1989 WL 23790) (*D'Oench* doctrine protects FSLIC and its successor in interest against affirmative defenses and counterclaims).

8. The Restated Conveyance Agreement is labeled Exhibit 2053, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment.

9. The Restated Conveyance Agreement is dated November 19, 1986 but specifically replaces the Conveyance Agreement of November 10, 1986 and is "effective as of and retroactive to November 10, 1986." Restated Conveyance Agreement at 1.

(iv) all loan administration contracts or other contracts that provide for the servicing of mortgage loans ... including, without limitation, contracts relating to the servicing of (a) ... mortgage loans that are issued under the authority of or in connection with programs of any state, local or other governmental authority (collectively, the "Agency Administration Contracts") and (b) mortgage loans owned or held directly by or for the account of private investors, or mortgage loans that are otherwise not Agency Administration Contracts (the "Independent Servicing Agreements");

(v) all escrow, impound and custodial accounts relating to the Loan Administration Contracts.

. . . .

Section 1.2 *Consideration for Contribution and Transfer.* In consideration for the properties, assets, interests and rights described in Section 1.1, Commonwealth Mortgage hereby assumes, and agrees to be responsible for, pay, and discharge, all liabilities and obligations related to such properties, assets, interests and rights ... including, but not limited to, the following:

. . . .

(b) liabilities and obligations relating to the maintenance of impound and escrow accounts;

. . . .

(e) except for [certain listed lawsuits], all lawsuits currently existing or hereafter arising, regardless of whether they arise from events, acts or omissions to act or allegations of events, acts or omissions to act prior to or subsequent to Closing Time....

. . . .

Section 6.1 *Subrogation.* Commonwealth Mortgage, the Operating Partnership and all persons claiming by, through or under them shall, to the extent permitted by law, be subrogated to, respectively, all of CSA's and CMCA's rights in warranties and covenants made by others with respect to the Mortgage Banking Assets.

RCA, Exhibit 2053, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment.

Plaintiffs also base their argument on the deposition testimony of Betty Martin that the limited partnership received the real estate sales commission of $179,372.02 paid by plaintiffs as a condition of their purchase of the Project, and that both the NOI account and the $600,000 break-even account were held at Commonwealth Savings in the name of the limited partnership.

The court finds no issue of material fact exists as to this alleged transfer of the Santa Fe Project asset from Commonwealth Savings to the limited partnership. The RCA conveyed to the limited partnership the right to "service" certain loans in Commonwealth's loan portfolio. The RCA clearly expresses, in the opening paragraphs preceding Section 1.1, that Commonwealth Savings is transferring "certain of their assets and *related* rights, subject to certain *related* liabilities and obligations" in exchange for a certain number of limited partnership interests. RCA at 1 (emphasis added). Section 1.1(iv) transfers loan servicing contracts and Section 1.1(v) transfers all escrow, impound, and custodial accounts relating to these loan servicing contracts.

In Section 1.2, the limited partnership assumes, under subsection (b), the "liabilities and obligations *relating to* the maintenance of impound and escrow accounts" and, under subsection (e), certain lawsuits *relating to* the servicing function. Section 1.2 specifically states that the limited partnership "agrees to be responsible for, pay, and discharge, all liabilities and obligations related to" the asset or the right which was transferred. In the case of the Santa Fe Project, Commonwealth Savings transferred the right to service the loan. The limited partnership assumed liabilities, obligations, and lawsuits *related to* this right.

Discovery that has been taken on this issue provides further support for this interpretation of the RCA. In July of 1989, plaintiffs took the depositions of Frank D. Norris, FDIC Managing Agent for the FSLIC as conservator of Commonwealth

Savings and Commonwealth Federal; Eric Milton Schumann, Executive Vice President and Chief Financial Officer of Commonwealth Savings and Commonwealth Federal; Max T. Patton, Senior Vice President and Manager of the Commercial Lending Department of Commonwealth Savings and Commonwealth Federal; Betty W. Martin, Senior Vice President for Loan Administration of Commonwealth Savings and Commonwealth Federal; Sam D. Amspoker, Executive Vice President of the Interim Construction Lending Department of Commonwealth Savings and Commonwealth Federal; and Richard F. Malloy, Executive Vice President of Commonwealth Mortgage Corporation of America, the general partner of Commonwealth Mortgage of America, L.P. and Commonwealth Mortgage Company of America, L.P.

The court has extensively reviewed the deposition transcripts submitted as exhibits by the parties [10] and finds that these individuals uniformly testified [11] that their understanding of the conveyance to the limited partnership was that the servicing function, and only the servicing function, was transferred to the limited partnership and that the Santa Fe Project remained an asset of Commonwealth Savings. The Santa Fe Project asset, of course, ultimately became an asset of Commonwealth Federal.

Defendants also produced the following documents, all of which include the Santa Fe Project: (1) the inventory of outstanding letters of credit and other bond obligations of Commonwealth Savings as of February 28, 1989 (shortly before Commonwealth Savings was placed into conservatorship on March 8, 1989); (2) the Bond Portfolio Schedule of Commonwealth Federal as of May 31, 1989; (3) the projection of funding obligations and receipts for the tax exempt bond projects of Commonwealth Federal as of May 30, 1989. *See* Defendants' Reply Memorandum in Support of Summary Judgment, Exhibits A, B, and C respectively. In addition, a Memorandum of Appointment of Receiver and Transfer and Assignment of Assets from Commonwealth Savings to Commonwealth Federal was executed by Mr. Norris, as Managing Agent for the FSLIC, which specifically listed the Santa Fe Project. *See id.*, Exhibit D.

As to the real estate commission received as income by the limited partnership, defendants, in their Comprehensive Statement of Undisputed Facts, filed with the court on January 4, 1989, stated that "pursuant to the First Addendum to the Reimbursement Agreement [dated October 30, 1984, and executed by Commonwealth and Santa Fe] Commonwealth, through Commonwealth

---

**10.** *See* Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment; Defendants' Table of Authorities to Reply Memorandum in Support of Summary Judgment.

**11.** Plaintiffs have asked the court to completely disregard the testimony of Mr. Patton because they find a discrepancy between his affidavit of June 19, 1989, and his deposition of July 11, 1989. Specifically, plaintiffs argue that, in his affidavit, Mr. Patton testified he reviewed and was familiar with the conveyance agreement relating to the transfer of certain banking assets. In his subsequent deposition, however, Mr. Patton admitted that he first saw the RCA on July 10, 1989, the day before his deposition testimony.

Despite this inconsistency as to *when* Mr. Patton first saw the RCA, a careful examination of Mr. Patton's affidavit and deposition testimony reveals that both are consistent as to Mr. Patton's understanding of what was involved in the transfer to the limited partnership. Mr. Patton testified in his affidavit that the Santa Fe Project asset was never transferred to Commonwealth Mortgage Co. of America, L.P. or any other entity. *See* Patton Affidavit, Exhibit 2064 at 3, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment. Mr. Patton testified in his deposition that it was his understanding, from both the language of the RCA *and* his general understanding from working at Commonwealth for two years, that only the servicing rights and contracts were transferred to the limited partnership. *See* Patton Deposition at 47–8, Exhibit G, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment.

Even if the court were to disregard Mr. Patton's testimony concerning this transfer-out issue, all other parties involved in this transaction testified that they understood that Commonwealth Savings transferred only the servicing function for the Santa Fe Project and that the asset itself remained with Commonwealth Savings.

Mortgage Corporation,[12] began attempting to market the Santa Fe project on or about January 4, 1985." *See* Defendants' Comprehensive Statement of Undisputed Facts at 8–9. Furthermore, Charlie Geiss, a real estate broker with Commonwealth Mortgage Corporation, contacted potential buyers in an effort to market the Project. *Id.* at 9. Payment of the real estate commission is irrelevant in determining whether Commonwealth Savings transferred the entire Santa Fe asset to the limited partnership.

As to the NOI and the $600,000 break-even accounts that were set up as custodial accounts at Commonwealth Savings in the name of the limited partnership, Betty Martin has testified that the servicing rights related to the Santa Fe Project were transferred to the limited partnership. Ms. Martin further explained that when funds are received (i.e. when payments are made), these funds go into custodial accounts in Commonwealth Savings, with the account set up in the name of the limited partnership *as servicer. See* Martin Deposition at 19, Exhibit E, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment. Clearly, the custodial, impound, or escrow accounts relating to the servicing of bond loan transactions are held in the name of the limited partnership incidental to their servicing function. Ms. Martin further explained that the custodial bank accounts are not carried on the general ledger of the limited partnership, but only on Commonwealth Savings' general ledger. *Id.* at 50–52.

The same reasoning applies to both the subrogation and the assumption of liabilities provisions of the RCA. Both must be viewed in the context of the entire document. In consideration of the transfer of the right to service certain loans, the limited partnership agreed to "be responsible for paying, and discharging, all liabilities and obligations *related to* " this right. *See*

RCA § 1.2 (emphasis added). Additionally, the limited partnership is subrogated only to the extent of the "Mortgage Banking Assets" transferred. *See* RCA § 6.1. One must necessarily refer back to Section 1.1 to determine what mortgage banking assets were transferred. Under subsections (iv) and (v) of that section, Commonwealth Savings transferred the right to service certain mortgage loans and all escrow accounts relating thereto.

As to this transfer-out issue, the plaintiffs have presented no evidence, short of their interpretation of the RCA, that Commonwealth transferred its entire interest in the Santa Fe Project to the limited partnership. Clearly, plaintiffs have not met their burden under *Celotex* or *Liberty Lobby*.

3. *Plaintiffs Have Not Met the Requirements of the D'Oench Doctrine and § 1823(e).*

■ Plaintiffs argue that "[a]ssuming *arguendo* the representations by Commonwealth Savings that the $600,000 breakeven account would be sufficient to fund all future operating deficits" might constitute an "agreement" that falls within the ambit of the *D'Oench* doctrine, the agreement satisfies the requirements set forth in Section 1823(e). Thus, they argue, it is not a "secret agreement" within the meaning of the *D'Oench* doctrine. Plaintiffs Memorandum in Opposition to the FSLIC's Motion for Summary Judgment at 44.

To support their argument, plaintiffs rely on three documents from which they argue a "reasonable inference" could be drawn that the alleged misrepresentations were actually on the books of Commonwealth Savings.[13] The three documents relied on by plaintiffs are: (1) the December 18, 1986, approval by Commonwealth's Senior Loan Committee of the Santa Fe Project sale to the plaintiffs; (2) the December 31, 1986, NOI Agreement; and (3) the January 5, 1987, memorandum from Will Fisher and

---

**12.** Commonwealth Mortgage Corporation is the general partner of Commonwealth Mortgage of America, L.P.

**13.** "[T]he plain inference is that the Senior Loan Committee knew, approved and agreed that the

$600,000 'satisfactory' escrow account established pursuant to the NOI Agreement would carry the project to break-even." Plaintiffs' Memorandum in Opposition to FSLIC's Motion for Summary Judgment at 47.

Donald Sampley to the Senior Loan Committee.

With reference to the December 18 approval of the sale by the Senior Loan Committee, plaintiffs argue that "Commonwealth Savings' Senior Loan Committee approved the sale to plaintiffs on a refunded basis conditioned upon plaintiffs' 'providing *satisfactory* evidence of its capacity to fund the additional $230,000 [on a refunded basis] *until project breakeven.*'" Plaintiffs Memorandum in Opposition to the FSLIC's Motion for Summary Judgment at 45 (emphasis in original). The actual document reads, in pertinent part, as follows:

> In addition to the above cash from buyer at closing, the buyer's proforma shows an additional $230,000 of negatives that buyer will fund before the project reaches break even. (Purchaser to provide satisfactory evidence of its capacity to fund the additional $230,000 until project breakeven.[) ]

Exhibit 1022, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment.

This language is not, by any stretch of the imagination, a guarantee by Commonwealth that the $600,000 break-even account would be sufficient to fund all future operating deficits.

Plaintiffs rely on the following language from the NOI Agreement[14] executed by the parties on December 31, 1989:

> Simultaneously with the execution of this Agreement, and as a condition to Commonwealth's consenting to [plaintiffs'] acquisition of the Project, Cypress is depositing into a non-interest-bearing escrow account at Commonwealth cash in the amount of $600,000 (the "Deposit") for the purpose of securing payment of Debt Service for the months of January 1987 through April 1987, inclusive (the "Draw Period").

Plaintiffs Memorandum in Opposition to the FSLIC's Motion for Summary Judgment at 45.

Again, this is not an express guarantee by Commonwealth that the $600,000 break-even account would be sufficient to fund all future operating deficits.

The January 5, 1987 memorandum from Fisher and Sampley to the Senior Loan Committee, which specifically refers to the December 18 approval, states that the ownership of the Project was transferred to plaintiffs in December of 1986, with plaintiffs "establishing an interest bearing $600,000 escrow account for future operating deficits." *See* Exhibit 2063, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment. Again, plaintiffs fail to show an express guarantee that future operating deficits would be limited to $600,000.

Assuming, *arguendo*, that the documents do support an inference of a break-even guarantee, plaintiffs rely on *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981), to argue that summary judgment must be denied if "a document arguably meet[s] the nonsecrecy requirements of § 1823(e)." *Id.* at 748. Plaintiffs' argument must necessarily fail. The document at issue in *Howell* was a lease which expressly contained ongoing mutual obligations on the part of each party. *Id.* at 747. The Seventh Circuit held that the district court erroneously granted summary judgment on the basis of a factual finding that the leases did not contain the mutual obligations of each party. Moreover, we note that since the *Howell* decision was rendered, the Seventh Circuit has recognized that the broad language of that opinion "must not be ripped from its context to make a rule far broader than the factual circumstances which called forth the language." *FDIC v. O'Neil*, 809 F.2d 350, 354 (7th Cir.1987).

More importantly, however, the *Howell* decision was rendered prior to the Supreme Court's decision in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), in which the Court held that the requirements of Section 1823(e) are certain

---

**14.** *See* Exhibit 2074, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment.

and categorical. *Id.* at 95, 108 S.Ct. at 403. *See Beighley v. FDIC,* 868 F.2d 776, 782 (5th Cir.1989) ("In a recent decision construing the statute, the Supreme Court noted that the requirements of § 1823(e) are certain and 'categorical.'"). In *Beighley,* the Fifth Circuit explained that even when there is little doubt that an agreement can be inferred from reading certain documents together, an inference of an alleged agreement "does not meet the categorical requirements of § 1823(e)." *Id.* at 782–83. The court, therefore, rejects plaintiffs' argument that the alleged misrepresentations met the requirements of the *D'Oench* doctrine and Section 1823(e).

### 4. Plaintiffs Are Not Completely Innocent Under Meo.

■ Plaintiffs argue that they are completely innocent and did not lend themselves to any secret agreement to deceive the FSLIC. Plaintiffs rely on *FDIC v. Meo,* 505 F.2d 790 (9th Cir.1974), where the Ninth Circuit stated that "[a]lthough this [*D'Oench*] estoppel doctrine may apply even though the maker did not intend to deceive creditors or depositors, there at least must be a showing that 'the maker lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled.'" *Id.* at 792 (quoting *D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 461, 62 S.Ct. 676, 681, 86 L.Ed. 956 (1942)).

The *Meo* decision was a relatively early interpretation of the *D'Oench* doctrine by a court that was presented with an egregious fact situation. In *Meo,* the defendant executed a promissory note to a bank to purchase shares of the bank's common stock, which was then to be held as collateral for the loan. Unknown to the defendant, the bank issued voting trust certificates rather than common stock. Meanwhile, the bank became insolvent and the FDIC sued defendant on the note. The trial court granted summary judgment for the FDIC.

The Ninth Circuit reversed and granted judgment in favor of defendant, holding that defendant's failure of consideration defense was not barred by the *D'Oench* doctrine since defendant was a completely innocent party with regard to the bank's wrongful action of issuing voting trust certificates instead of common stock shares. *Id.* at 792–93. The Ninth Circuit subsequently narrowed *Meo* by distinguishing the fact situation in *Meo* from that involving "a collateral oral agreement between ... [an] officer of the bank ... and [the maker of the notes] that the notes were solely accommodation notes and would never have to be paid by the [maker]." *FDIC v. First Nat'l Fin. Co.,* 587 F.2d 1009, 1011 (9th Cir.1978). The court recognized that, in *Meo,* "there was no secret agreement whereby the assets of the bank would be overstated. There was simply a failure of consideration of which the promisor was unaware until after the bank was closed and the suit was filed by the FDIC." *Id.* at 1012.

Other courts have applied the *D'Oench* doctrine to bar defenses to the alleged fraud of bank officers because the debtor failed to ensure that the representations were expressed in the loan documents. *See Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *Mainland Sav. Ass'n v. Riverfront Assoc., Ltd.,* 872 F.2d 955 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989). In the instant case, plaintiffs do not fall within the *Meo* exception of "clearly innocent" parties. As this court has already noted, plaintiffs should have insured that the alleged misrepresentations were incorporated into the written loan documents if they intended to rely on them. *See* Memorandum Decision and Order, May 8, 1989, at 38. By failing to get the alleged misrepresentations in writing, plaintiffs "participated in an arrangement likely to mislead" the FSLIC. *FDIC v. Texarkana Nat'l Bank,* 874 F.2d 264, 268 (5th Cir.1989). The fact that plaintiffs did not intend to deceive bank examiners is irrelevant. *FDIC v. Van Laanen,* 769 F.2d 666, 667 (10th Cir.1985); *FDIC v. First Nat'l Fin. Co.,* 587 F.2d 1009, 1012 (9th Cir.1978).

■ Plaintiffs' argument that the FSLIC was not, in fact, misled is of no avail. The Supreme Court, in *Langley v. FDIC,* 484

U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), stated that "knowledge of the misrepresentation by the FDIC prior to its acquisition of the note is not relevant to whether § 1823(e) applies." *Id.* at 94, 108 S.Ct. at 402. *Langley* has been expanded to protect the FSLIC with respect to prior knowledge of a particular misrepresentation or claim. "FSLIC's knowledge, however, does not make the *D'Oench* doctrine inapplicable." *Andrew D. Taylor Trust v. Sec. Trust Fed. Sav. and Loan Ass'n,* 844 F.2d 337, 341 (6th Cir.1988).

Plaintiffs' additional argument that the insolvency of Commonwealth caused no impact on the FSLIC insurance fund also has no merit. As the *Langley* court indicated, "one purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets." *Langley v. FDIC,* 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). The Court further stated that "[t]he harm to the FDIC caused by the failure to record occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available protective measures, including termination of the bank's deposit insurance." *Id.* at 95, 108 S.Ct. at 403.

Plaintiffs' allegation that the Receiver's Agreement of May 25, 1989, was nothing more than a sham is specious at best and irrelevant to our decision today. The Receiver's Agreement, executed by the FSLIC as receiver for Commonwealth Savings and the FSLIC in its corporate capacity, enabled the corporate entity to purchase the unacceptable assets of the receiver. Plaintiffs assert this argument as further proof that there was no impact on FSLIC insurance funds.

A careful reading of the Receiver's Agreement, executed on the same date as the Acquisition Agreement between the receiver and Commonwealth Federal, indicates that it specifically refers to the Acquisition Agreement, "pursuant to which the ACQUIRING ASSOCIATION [Commonwealth Federal] will purchase substantially all of the assets ... of the CLOSED ASSOCIATION [Commonwealth Savings]". *See* Receiver's Agreement at 2, Exhibit 2051, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment. The Receiver's Agreement further provided that the FSLIC, in its corporate capacity, agrees to purchase all Commonwealth Savings' assets not purchased by Commonwealth Federal pursuant to the Acquisition Agreement. *Id.* at 3.

Plaintiffs rely on Mr. Norris' testimony that no assets were purchased by the FSLIC in its corporate capacity pursuant to the Receiver's Agreement and that he had no idea why the Receiver's Agreement between the FSLIC as receiver and the FSLIC in its corporate capacity had been executed. Plaintiffs neglect to mention, however, that Mr. Norris then explained that "I've testified earlier that the acquiring bank or acquiring association here [Commonwealth Federal] purchased all of the assets from the receiver." Norris Deposition at 102, Exhibit F, Plaintiffs' Appendix of Exhibits in Opposition to the FSLIC's Motion for Summary Judgment.

*5. The D'Oench Doctrine Applies to this Bond Loan Transaction.*

■ Plaintiffs attempt to distinguish the facts in the instant case as a "credit enhancement transaction" rather than a loan. As such, they argue, the *D'Oench* doctrine does not apply. The court does not agree. Under the bond loan documents, which plaintiffs assumed, Zions National Bank, as Trustee for the bondholders, makes semiannual draws against Commonwealth's seventeen million dollar Letter of Credit issued by Commonwealth to guarantee plaintiffs' performance of its obligations under the bond loan. Under the Reimbursement Agreement, plaintiffs are to make monthly payments to Commonwealth. If the monthly payments do not cover the amount of the draw against Commonwealth, plaintiffs are obligated to reimburse Commonwealth for the difference. *See* Reimbursement Agreement § 3.02, Exhibit FF, Plaintiffs' Appendix to Omnibus Memorandum in Opposition to Motions for Summary Judgment of Commonwealth, Klein and Busch.

Commonwealth has honored its obligations under the bond loan documents and its Letter of Credit. At oral argument, defendants estimated that they have advanced in excess of three million dollars under the Letter of Credit. This court will not draw such a fine distinction between a commitment to fund under a Letter of Credit and a transaction that is carried on a financial institution's books as a "loan."

Further, the *D'Oench* doctrine has never been restricted to traditional loan transactions. The doctrine has been expanded to encompass any claim against an insolvent institution that would either diminish the value of the assets held by the FSLIC or increase the liabilities of the insolvent institution. *First State Bank of Wayne County v. City and County Bank of Knox County,* 872 F.2d 707, 716–17 (6th Cir. 1989). The *D'Oench* doctrine has been applied to bar an unwritten agreement to fund (*Beighley v. FDIC,* 868 F.2d 776 (5th Cir.1989)); pledge agreements (*Andrew D. Taylor Trust v. Sec. Trust Fed. Sav. and Loan Ass'n,* 844 F.2d 337 (6th Cir.1988)); an unwritten agreement between guarantor and bank that loan proceeds would not be released without guarantor's consent (*Firstsouth, F.A. v. Aqua Constr., Inc.,* 858 F.2d 441 (8th Cir.1988)); and assumption agreements (*FDIC v. Van Laanen,* 769 F.2d 666, 667 (10th Cir.1985)).

*6. Plaintiffs' Agreement Is Not Void Ab Initio.*

 Plaintiffs argue that defendants violated numerous federal and Texas banking laws when the parties negotiated the purchase of the Santa Fe Project. These violations of law, they argue, render the agreement between plaintiffs and defendants *void ab initio* and one which falls outside the *D'Oench* doctrine. Plaintiffs rely on a 1957 Utah case concerning an action to recover commissions on the sale of stock subscriptions. *McCormick v. Life Ins. Corp.,* 6 Utah 2d 170, 308 P.2d 949 (1957).

In *McCormick,* the Utah Supreme Court stated that "courts look at the over-all picture of each such questioned contract and determine upon the facts of the individual case" whether the illegal contract is enforceable. *Id.* at 952. In making this determination, the court considers: "(a) the degree of criminality or evil involved; (b) the moral quality of the conduct of the parties; (c) comparison between them as to guilt or innocence; (d) the equities between them; and (e) the effect upon third parties or the public." *Id.* Plaintiffs make much of the last factor in that enforcement of their agreement "would have the harmful effect of depriving the public and third parties of the benefits that the banking laws and regulations seek to provide." Plaintiffs' Response to the RTC's Second Supplemental Memorandum at 36.

This court does not accept plaintiffs' argument that the agreement between plaintiffs and defendants should be considered void and unenforceable because of alleged federal and state banking regulations. We note that the *McCormick* court, in examining the "so-called general rule that contracts in violation of law are void and unenforceable," stated that "arbitrary refusal to grant relief under contracts merely in violation of statute often brings about such incongruous results in giving advantages to wrongdoers and penalizing the relatively innocent that the courts have carved out so many exceptions to the so-called 'general rule' that it can hardly be properly so denominated." *McCormick v. Life Ins. Corp.,* 308 P.2d at 951.

**B. The FIRRE Act**

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989), became law on August 9, 1989. Both parties agree that the Act constitutes sweeping reform of federal banking law. The Act abolishes the FSLIC and creates the Resolution Trust Corporation, which "shall succeed the Federal Savings and Loan Insurance Corporation as conservator or receiver with respect to any institution for which the Federal Savings and Loan Insurance Corporation was appointed conservator or receiver during the period beginning on January 1, 1989 and ending on such date

of enactment." *Id.* § 501, at 370. In addition, the FIRRE Act provides that the RTC "shall be substituted as a party in any civil action, suit, or proceeding to which its predecessor in interest was a party."[15] *Id.* at 389.

Significantly, the FIRRE Act provides that the RTC

shall have the same powers and rights to carry out its duties with respect to [depository institutions placed into receivership or conservatorship at any time between January 1, 1989 and August 9, 1989] as the Federal Deposit Insurance Corporation has under sections 11 [12 U.S.C.A. § 1821], 12 [12 U.S.C.A. § 1822], and 13 [12 U.S.C.A. § 1823] of the Federal Deposit Insurance Act with respect to insured depository institutions.

*Id.* at 370. Thus, the Section 1823(e) protection formerly afforded the FDIC in its corporate capacity under section 13 of the Federal Deposit Insurance Act [the "FDIA"] now applies directly to the RTC by virtue of the FIRRE Act. Section 1823(e) of the FDIA, as amended by the FIRRE Act, provides as follows:

(e) AGREEMENTS AGAINST INTERESTS OF CORPORATION.—No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 11, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be

reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

*Id.* § 217, at 256.

The rights of creditors (other than insured depositors) are governed by Section 11 of the FDIA (12 U.S.C.A. § 1821). Section 1821, as amended by the FIRRE Act, provides a maximum liability for the RTC.

(i) VALUATION OF CLAIMS IN DEFAULT.—

. . . .

(2) MAXIMUM LIABILITY.—The maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and liabilities of such institution without exercising the Corporation's authority under subsection (n) of this subsection [establishing a bridge bank] or section 13 [sale or pledge of insured depository institution's assets to the Corporation].

Pub.L. No. 101–73, § 212, 103 Stat. 222, 242 (1989).

■ As noted at the beginning of our discussion of defendants' motion for summary judgment, the RTC, as a successor in interest to the FSLIC, is entitled to assert the *D'Oench* doctrine to protect it from claims originally asserted against the failed financial institution. *RSR Properties, Inc. v. FDIC*, 706 F.Supp. 524, 531 (W.D.Tex. 1989); *Gulf Fed. Sav. & Loan Ass'n v. Mulderig*, No. 87–3503 (E.D.La. Mar. 10, 1989) (1989 WL 23790). Defendants argue that the FIRRE Act expands the protections afforded the RTC as conservator or receiver of a failed institution by making Section 1823(e) specifically applicable to the RTC and by limiting the liability of the

---

**15.** This provision applies "with respect to institutions which are subject to the management agreement dated February 7, 1989, among the Federal Savings and Loan Insurance Corpora-tion, the Federal Home Loan Bank Board and the Federal Deposit Insurance Corporation." Pub.L. No. 101–73, § 501, 103 Stat. 363, 389 (1989).

RTC for claims against the failed financial institution. The court agrees.

Plaintiffs argue that the protections afforded the RTC under the FIRRE Act are unavailable to defendants in this particular instance. A number of plaintiffs' arguments against the FIRRE Act are identical to those raised under the *D'Oench* doctrine. First, plaintiffs argue that the *Grubb* decision bars only defenses, not affirmative claims. Second, plaintiffs argue that the requirements of Section 1823(e) are met, because the agreement is not a secret side-agreement, but is in fact on the defendants' books. Third, plaintiffs argue that defendants' alleged violations of federal and Texas banking laws render their agreement *void ab initio*. The court has fully addressed and has rejected these arguments under its discussion of the *D'Oench* doctrine. We turn now to plaintiffs' specific arguments under the FIRRE Act.

*1. The FIRRE Act Protects the RTC Acting as Conservator.*

Plaintiffs admit that Section 1823(e) of the FDIA, as amended by the FIRRE Act, provides protection to the RTC in its capacity as receiver. Plaintiffs' Response to the RTC's Second Supplemental Memorandum at 5. Plaintiffs argue, however, that the RTC is not protected when acting as conservator. Plaintiffs rely on the fact that "receiver" is mentioned in Section 1823(e), as amended, whereas "conservator" is not. "No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 11, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation...." Pub.L. No. 101–73, § 217, 103 Stat. 254, 256 (1989).

This court does not read the newly amended Section 1823(e) so narrowly. First, plaintiffs acknowledge that prior to amendment, Section 1823(e) by its terms granted protection only to the FDIC in its corporate capacity, but that courts have extended this protection to the FDIC in its receivership capacity. *See* Plaintiffs' Response to RTC's Second Supplemental Memorandum at 5. Additionally, plaintiffs admit that courts have also extended Section 1823(e) protection to the FSLIC as receiver. *Id.* We note that at least two courts have extended this protection to the FSLIC when acting as conservator. *FSLIC v. Musacchio,* 695 F.Supp. 1044 (N.D.Cal.1988); *FSLIC v. Aubin,* Unpublished Memorandum Decision, Civ. No. 3–87–2776H, 1988 WL 156178 (N.D.Tex., Sept. 2, 1988). In *Aubin,* the court rejected any distinction between the FSLIC as a receiver and as a conservator:

> The Reese [d]efendants ... argue that the *D'Oench, Duhme* doctrine either does not apply or does not apply as broadly when the FSLIC is acting as a conservator rather than as a receiver. Their argument is faulty because it does not take into account the policy underlying the doctrine, that is: 'to protect [federal banking agencies] and the public funds [they] administer, against misrepresentations as to the securities or other assets in the portfolios of the bank which [they] insure or to which [they] make loans.' *Lupin v. FSLIC,* No. 85–5896, 1987 WL 9106 (E.D.La. Mar. 31, 1987). Furthermore, the Reese [d]efendants floss over the substantial similarities in terms of responsibilities and powers of the FSLIC as receiver and the FSLIC as conservator. *Compare* 12 C.F.R. § 548.2 *with* 12 C.F.R. § 549.3. Most importantly, however, the Reese [d]efendants fail to note that at least one court, in the only case found on point, has clearly held the *D'Oench, Duhme* doctrine applicable to the FSLIC acting as conservator. *See FSLIC v. Musacchio,* [695 F.Supp. 1044 (N.D.Cal.1988)]. The court agrees with the *Musacchio* court that the *D'Oench, Duhme* doctrine applies to the FSLIC acting in its capacity as a conservator to the same extent that it applies to the FSLIC acting as a receiver.

*Aubin*, Memorandum Decision, at 14–15.[16]

More importantly, Section 1823(e) by its terms applies directly to the instant case. Section 1823(e) protection is available to the RTC for any asset it acquired "by purchase or as receiver." In this case, Commonwealth Savings was placed into conservatorship, with the FSLIC as sole conservator, on March 8, 1989. On May 23, 1989, the FSLIC was appointed receiver of Commonwealth Savings and by operation of law the FSLIC acquired all right, title, and interest in Commonwealth Savings' assets. These assets included the bond loan transaction between Commonwealth Savings and plaintiffs. On May 25, 1989, the FSLIC as receiver of Commonwealth Savings entered into a purchase agreement with Commonwealth Federal, whereby the FSLIC, as conservator of Commonwealth Federal, acquired all assets held by the FSLIC as receiver. *See* Acquisition Agreement Between the FSLIC as Receiver for Commonwealth Savings Association and Commonwealth Federal Savings Association § 2, Exhibit B, Defendants' Supplemental Memorandum in Support of Motion for Summary Judgment.

Under this scenario, Section 1823(e) applies to the RTC with regard to the assets that were acquired as a matter of law by the FSLIC as receiver of Commonwealth Savings and that were subsequently transferred to Commonwealth Federal under the Acquisition Agreement.

### 2. *Commonwealth Federal Is Entitled to Protection Under the FIRRE Act.*

Plaintiffs argue that, although the RTC may charter a "bridge bank" under the FIRRE Act, no protections are afforded to a "bridge savings and loan." Plaintiffs are referring to the FIRRE Act's amendment of Section 11 of the FDIA which allows for the creation of a national bank, referred to as a bridge bank. A bridge bank may, *inter alia*, "purchase such assets ... of such insured bank or banks that is or are in default ... as the Corporation may, in its discretion, determine to be appropriate." Pub.L. No. 101–73, § 214, 103 Stat. 246, 246 (1989). Under this particular section of the FIRRE Act, bridge banks themselves are afforded protection identical to that provided for in Section 1823(e).[17]

Defendants argue, however, that Section 212 of the FIRRE Act creates a right for a receiver to create a bridge savings and loan (Commonwealth Federal) by amending Section 11 of the FDIA (12 U.S.C.A. § 1821).

(F) ORGANIZATION OF NEW INSTITUTIONS.—The Corporation [including the RTC] may, as receiver—

(i) with respect to savings associations and by application to the Director of the Office of Thrift Supervision, organize a new Federal savings association to take over such assets or such liabilities as the Corporation may determine to be appropriate[.]

Pub.L. No. 101–73, § 212, 103 Stat. 222, 226 (1989). The court agrees. Furthermore, although Section 214 directly provides bridge banks with Section 1823(e)-type protection, a savings and loan created under Section 11 of the FDIA (12 U.S.C.A. § 1821), as discussed above, is entitled to the protections afforded by 12 U.S.C.A. § 1823(e).

---

16. *See* Exhibit G, Defendants' Memorandum in Support of the FSLIC's Motion for Summary Judgment.

17. Section 214 of the FIRRE Act provides in part:

(I) no agreement which tends to diminish or defeat the right, title or interest of a bridge bank in any asset of an insured bank in default acquired by it shall be valid against the bridge bank unless such agreement—
(i) is in writing,
(ii) was executed by such insured bank in default and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by such insured bank in default, (iii) was approved by the board of directors of such insured bank in default or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(iv) has been, continuously from the time of its execution, an official record of such insured bank in default[.]

Pub.L. No. 101–73, § 214, 103 Stat. 246, 249 (1989).

*3. Plaintiffs' Claims Are also Limited by the Maximum Liability of the FIRRE Act.*[18]

 Plaintiffs argue that the FIRRE Act's maximum liability does not apply in this instance because it applies only under two circumstances: "(1) [i]f a creditor has a claim directly against the RTC as receiver; and (2) [i]f the claimant has a claim directly against the received depository. institution." Plaintiffs' Response to the RTC's Second Supplemental Memorandum at 19. Plaintiffs · argue that their claims do not· fall within these two circumstances because they have claims directly against Commonwealth Federal, the transferee depository institution and not the received institution.

This court does not agree. Plaintiffs' claims against Commonwealth Federal are identical to the claims plaintiffs originally asserted against Commonwealth Savings, the received institution. Commonwealth Federal is presently in conservatorship under the RTC. The FIRRE Act provides that the maximum liability of the RTC, *acting as receiver or in any other capacity*, is equal to the amount plaintiffs, as general creditors of Commonwealth, would have received on the day Commonwealth Savings was placed into receivership. Pub.L. No. 101-73, § 212, 103 Stat. 222,

242 (1989) (emphasis added). Prior to its dissolution, the FHLBB determined that Commonwealth had no assets to satisfy unsecured creditors and that the claims of unsecured creditors against Commonwealth on the date of receivership were worthless.[19] *See* Resolution No. 89-1501 at 4, Exhibit A, Defendants' Supplemental Memorandum in Support of Summary Judgment.

*4. Post–Acquisition Claims.*

Finally, plaintiffs argue that their Second Amended Complaint sets forth certain additional claims that refer to post-acquisition acts that are not barred by either the *D'Oench* doctrine or the FIRRE Act. Basically, plaintiffs argue that their breach of fiduciary duty claim originally asserted against Commonwealth, Klein Financial Corporation, and Klein continues following the appointment of the FSLIC as conservator for Commonwealth Savings. The "FSLIC, FDIC, RTC and Commonwealth Federal further violated their fiduciary duties to plaintiffs by failing and refusing to deal fairly and honestly with plaintiffs, the Project or the claims asserted herein." Plaintiffs' Second Amended Complaint at 47. Plaintiffs further allege, on information and belief, that instead of dealing fairly and honestly with plaintiffs, defendants "prepared false resolutions and declara-

---

**18.** We address plaintiffs' argument even though Section 1823(e) applies directly to the RTC and bars plaintiffs' claims against defendants.

**19.** Plaintiffs also argue that the RTC, as conservator for Commonwealth Federal, in honoring its obligation under the Letter of Credit, has made preferential payments to certain general creditors in violation of the antipreference provisions of federal law. This claim relates to plaintiffs' sixth cause of action in their second amended complaint which seeks declaratory relief that the RTC, as the successor in interest to the FSLIC, is liable to plaintiffs for violation of the anti-preference provisions of federal and Texas law. *See* Plaintiffs' Second Amended Complaint ¶ 92F. The court addresses plaintiffs' motion for leave to file a second amended complaint at the end of this memorandum decision. Plaintiffs also seek declaratory relief on the allegations that defendants violated a number of federal regulations promulgated by the FHLBB, as well as a number of rules adopted

by the Texas Finance Commission's Savings and Loan Section.

Plaintiffs, however, cite to no specific federal or Texas laws or regulations, in either their summary judgment briefings or their second amended complaint, concerning anti-preference provisions. Furthermore, plaintiffs are not now, and never have been, creditors of Commonwealth. Moreover, the court is persuaded, under *Taylor v. Citizens Fed. Sav. and Loan Ass'n,* 846 F.2d 1320 (11th Cir.1988), that plaintiffs hold no private right of action for violations of regulations promulgated by the FHLBB. Finally, as discussed in this section, any alleged claims by plaintiffs against the RTC not disposed of by Section 1823(e) are limited to that amount which plaintiffs might have received if Commonwealth Savings had liquidated its assets. Commonwealth Savings, at the time of its dissolution, had no assets to satisfy unsecured creditors, and the FHLBB determined that claims of unsecured creditors were worthless.

tions of insolvency for Commonwealth, while at the same time arranging for payment of other creditors of Commonwealth for the purpose of attempting to evade the claims asserted herein, gain control of the Project and inflict further loss and damage on plaintiffs." *Id.* Plaintiffs make the same argument for breach of covenant of good faith and fair dealing and for negligence.

Plaintiffs' allegation that defendants prepared false resolutions and declarations of insolvency for Commonwealth is interesting, to say the least. The court, however, after an exhaustive review of plaintiffs' briefings in response to defendants' motion for summary judgment, finds no evidence to support plaintiffs' assertion.

Clearly, plaintiffs' post-acquisition claims against the FSLIC, FDIC, RTC, and Commonwealth Federal of refusing to deal fairly and honestly with plaintiffs after the FSLIC was appointed conservator for Commonwealth Savings must fail. Once the FSLIC was appointed conservator of Commonwealth Savings, defendants had a right to assert the *D'Oench* doctrine as a bar to plaintiffs' claims. Defendants also had a right to assert the FIRRE Act as protection for the RTC. This court has now determined that defendants are protected by both the *D'Oench* doctrine and the FIRRE Act. Consequently, plaintiffs' arguments that the FSLIC, the FDIC, the RTC, and Commonwealth Federal (which is now in conservatorship under the RTC) refused to deal fairly and honestly with plaintiffs after the FSLIC was appointed conservator of Commonwealth Savings are of no avail.

## PLAINTIFFS' MOTION FOR WRIT OF ATTACHMENT

Plaintiffs request the court to issue a writ of attachment so that they may attach the NOI funds on deposit with the court and whatever beneficial interest defendants have in the Project. They argue that the "issuance of a writ of attachment is appropriate and necessary to secure any judgment rendered in favor of plaintiffs' against Commonwealth." *See* Plaintiffs' Memorandum in Support of Application for Issuance of Writ of Attachment at 2. In light of our decision on May 8, 1989, that awarded the Project NOI on deposit with

the court to Commonwealth and our decision today granting defendants' motion for summary judgment, plaintiffs' application for issuance of a writ of attachment is denied.

## PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PROPOSED ORDER FOR PARTIAL SUMMARY JUDGMENT

This court has previously granted Commonwealth Savings' motion for partial summary judgment, awarding to Commonwealth the NOI funds on deposit with the court. *See* Memorandum Decision and Order of May 8, 1989, at 40, 46–7. The court requested counsel for Commonwealth Savings to prepare an appropriate order respecting the release of those funds. *Id.* at 47. Commonwealth Savings subsequently submitted a proposed order, to which plaintiffs filed objections. In light of the court's previous rulings, plaintiffs' objections are denied.

## PLAINTIFFS' MOTION FOR RULE 11 SANCTIONS

Plaintiffs request the court to consider Rule 11 sanctions against defendants for two main reasons. First, plaintiffs argue that Commonwealth Savings improperly filed a motion for summary judgment under the *D'Oench* doctrine because Commonwealth Savings had no right or title to the Santa Fe Project (the transfer-out issue). Our previous discussion has disposed of this argument.

Second, plaintiffs argue that defendants did not timely advise plaintiffs and the court that Commonwealth Savings was placed into conservatorship under the FSLIC on March 8, 1989. Defendants argue that the delay in filing a motion to substitute the FSLIC and a motion for summary judgment under the *D'Oench* doctrine was due to the fact that there were summary judgment motions pending before the court at the time the conservatorship took place. The court can understand that defendants might not consider filing a second summary judgment motion at a time when the court has summary judgment motions under advisement. De-

fendants filed their motion for summary judgment under the *D'Oench* doctrine eight days after this court rendered its decision on the previous summary judgment motions.

Furthermore, as the court suggested during oral argument, Rule 11 of the Federal Rules of Civil Procedure addresses itself to the signing and filing of pleadings, motions, and other papers.[20] Commonwealth Savings was placed into conservatorship on March 8, 1989, and defendants filed their motion to substitute the FSLIC as conservator for Commonwealth Savings on May 16, 1989. Between March 8 and May 16, defendants filed the following motions and pleadings:

March 17 Motion to file overlength memo.

March 17 Reply memo in support of motion for protective order and for sanctions.

March 17 Request for oral argument.

April 5 Certificate of service.

April 10 Response to plaintiffs' motion for leave to continue discovery.

May 5 Motion for permission to copy tax information and memo in support.

May 5 Motion to compel discovery and memo in support.

May 12 Supplemental memo in opposition to plaintiffs' application for preliminary injunction and request for ruling.

May 12 Motion to compel discovery and memo in support.

The court is not persuaded that defendants' failure to include the fact that Commonwealth Savings was placed into conservatorship in the pleadings listed above violates Rule 11. With the exception of one item, all pleadings relate to either procedure or discovery. Defendants' supplemental memorandum in opposition to plaintiffs' application for preliminary injunction would probably have been the first appropriate pleading in which defendants should have disclosed the conservatorship. We note, however, that defendants filed their

motion to substitute the FSLIC four days later. The same reasoning applies to Commonwealth Savings' proposed order submitted to the court under cover of letter dated May 9, 1989. Accordingly, plaintiffs' motion for Rule 11 sanctions is denied.

## PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Finally, plaintiffs request leave to file a second amended complaint. The court respectfully denies plaintiffs' request for the following reasons.

The second amended complaint is substantially the same as the first amended complaint, with claims of fraud, negligent misrepresentation, breach of fiduciary duty, breach of covenant of good faith and fair dealing, and negligence. The second amended complaint, however, names a number of new defendants: Commonwealth Mortgage of America, L.P.; Commonwealth Mortgage Company of America, L.P.; Commonwealth Mortgage Corporation; the RTC; the FDIC; the FSLIC; William C. Fisher IV; S. Don Norris; and James J. Jackson. The five claims for relief are asserted against all defendants.

In light of our decision granting defendants' motion for summary judgment under both the *D'Oench* doctrine and the FIRRE Act, no reason exists to allow plaintiffs to add either of the limited partnership entities or the corporate general partner. That decision also resolves the need to add the FDIC, and the FSLIC, of course, no longer exists. As far as the RTC is concerned, we have granted defendants' motion to substitute the RTC as the proper party defendant and have also granted the RTC's motion for summary judgment.

■ As for Fisher, Jackson, and Norris, the court finds plaintiffs' motion to add these three individuals is not timely. Fisher was prominently named in plaintiffs' original complaint filed more than two

---

**20.** Rule 11 of the Federal Rules of Civil Procedure states in part:

The signature of an attorney or party constitutes a certificate by the signer that the signer

has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact....

years ago. As for Jackson and Norris, plaintiffs allege that both were Commonwealth officers and members of the Senior Loan Committee. As such, plaintiffs argue, they "knowingly authorized, affirmed and ratified the wrongful conduct of the remaining defendants." Plaintiffs' Second Amended Complaint, ¶¶ 23 and 24. Plaintiffs, however, have known the identities of the members of the Senior Loan Committee since April 25, 1988, over 18 months ago. *See* Commonwealth Savings Responses to Plaintiffs' First Set of Interrogatories, Nos. 47, 50, and 51. Consequently, plaintiffs' motion to amend their complaint to add these three individuals is not timely.

Plaintiffs also assert an additional claim—one for declaratory relief against all defendants. This claim encompasses two main issues: (1) the alleged transfer of the Project asset to the limited partnership and (2) the alleged banking violations which, plaintiffs argue, render their agreement with defendants void and unenforceable. The court has already addressed and rejected these two issues earlier in this decision.

### CONCLUSION

Accordingly, IT IS HEREBY ORDERED that

1. Defendants' motion for substitution of the Resolution Trust Corporation, as receiver for Commonwealth Savings and as conservator for Commonwealth Federal, is GRANTED, and by this Memorandum Decision and Order that substitution is accomplished.

2. Defendants' motion for summary judgment under the *D'Oench* doctrine and the FIRRE Act is GRANTED, and that relief will be entered by a separate judgment.

3. Plaintiffs' motion for issuance of a writ of attachment is DENIED by this Memorandum Decision and Order.

4. Plaintiffs' objections to defendants' proposed order for partial summary judgment are DENIED. The Clerk of the Court by a separate judgment is hereby ordered and directed to pay to the Resolution Trust Corporation, as conservator of

Commonwealth Federal, the total amount of NOI from the Santa Fe Project that has been deposited with the Clerk of the Court by Emerson Realty and Management. The Clerk of the Court may, if requested by the Resolution Trust Corporation, delay the liquidation of any investment of such funds to avoid any penalties which may result from immediate liquidation. Upon payment of the total amount of NOI, Emerson Realty and Management is discharged from all liability to any other party to these consolidated cases.

5. Plaintiffs' motion for issuance of an order to show cause for Rule 11 sanctions against defendants is DENIED by this Memorandum Decision and Order.

6. Plaintiffs' motion for leave to file a second amended complaint is DENIED by this Memorandum Decision and Order.

This Memorandum Decision and Order and the separate judgment entered this date will suffice as the court's ruling on these motions and no further order or judgment need be prepared by counsel. Also, inasmuch as the court has expressly determined that there is no just reason for delay, the judgment entered in accordance with this Memorandum Decision and Order is certified under Rule 54(b) Fed.R.Civ.P. as a final judgment.

### FINAL JUDGMENT ENTERED PURSUANT TO RULE 54(b) FED.R.CIV.P.

The court heard argument on a number of motions on November 2, 1989. Plaintiffs Castleglen, Inc. ("Castleglen" or "plaintiffs") and Larry B. Harvey were represented by David B. Erickson, Earl M. Benjamin, John A. O'Malley, and Douglas A. Rovens. Emerson Realty and Management was represented by Dennis L. Mangrum. Defendants Resolution Trust Corporation and the FSLIC, as receiver for Commonwealth Savings Association and as conservator for Commonwealth Federal Savings Association, were represented by Clark Waddoups, Patricia W. Christensen, Ronald G. Russell and Heidi E. C. Leithead. Defendants Klein Financial Corporation and Robert N. Klein II were represented

by Richard W. Casey, who was excused at the commencement of the hearing because of his clients' limited involvement in these motions.

This matter came before the court on the following motions: (1) defendant Resolution Trust Corporation's motion for substitution; (2) defendants Resolution Trust Corporation's and FSLIC's motion for summary judgment; (3) plaintiffs' motion for writ of attachment; (4) plaintiffs' objections to defendant FSLIC's proposed order for partial summary judgment; (5) plaintiffs' motion for issuance of an order to show cause for Rule 11 sanctions against defendant FSLIC; and (6) plaintiffs' motion for leave to file a second amended complaint.

Prior to the hearing, the court had carefully reviewed the written materials submitted by the parties. After taking the matter under advisement, the court further considered the voluminous record filed by the parties relating to these motions. The court today has entered a Memorandum Decision and Order deciding all of the foregoing motions, including that certain defendants are entitled to summary judgment against the plaintiffs. In accordance with that decision and pursuant to Rule 54(b) Fed.R.Civ.P.,

IT IS HEREBY ORDERED AND ADJUDGED as follows:

1. The defendants Resolution Trust Corporation and FSLIC, as receiver for Commonwealth Savings Association and as conservator for Commonwealth Federal Savings Association, are granted judgment in their favor and against plaintiffs of dismissal with prejudice of plaintiffs' amended complaint and said defendants are awarded their costs as against plaintiffs.

2. The Clerk of the Court is hereby ordered and directed to pay to the Resolution Trust Corporation, as conservator of Commonwealth Federal, the total amount of NOI from the Santa Fe Project that has been deposited with the Clerk of the Court by Emerson Realty and Management. The Clerk of the Court may, if requested by the Resolution Trust Corporation, delay the liquidation of any investment of such funds to avoid any penalties which may result from immediate liquidation. Upon payment of the total amount of NOI, Emerson Realty and Management is discharged from all liability to any other party in these consolidated cases.

3. This court makes an express determination pursuant to Rule 54(b) Fed.R.Civ.P. that there is no just reason for delay and expressly directs that this judgment be entered as a final judgment.